NORTHERN PACIFIC RAILWAY COMPANY, a corporation, and Northern Pacific Transport Co., a corporation, Appellants and Respondents,

v.

Anson J. ANDERSON, Ernest D. Nelson and Martin Vaaler, as members of the Public Service Commission of the State of North Dakota; A. L. Ford and the Brotherhood of Railroad Trainmen; Dale Langford and the Brotherhood of Locomotive Firemen & Enginemen; James McDonald and the Brotherhood of Railway Clerks; William Hanlon; O. O. Lundby; Farmers Union Elevator Company of Minnewaukan, Minnewaukan Commercial Club; Farmers Union Grain Terminal Association; City of Sykeston; Lunby Grain and Fuel Company; Equity Cooperative Elevator Company of Sheyenne, North Dakota; Maier Coach Lines; Northland Greyhound Lines, a corporation; Midwest Motor Express, Inc., a corporation; Dakota Transfer and Storage Company, a corporation; Northwest Dispatch, Inc., a corporation; North Dakota Motor Carriers Association; and Chamber of Commerce, Fargo, North Dakota, Respondents and Appellants.

No. 7744.

Supreme Court of North Dakota.

March 23, 1959.

Rehearing Denied April 6, 1959.

Leslie R. Burgum, Atty. Gen., and Gerald G. Glaser, Commerce Counsel, Bismarck, for appellant Public Service Commission.

Van Osdel & Foss, Fargo, for appellants Dakota Transfer & Storage Co., Northwest Dispatch, Inc., Northland Greyhound Lines, Maier Coach Lines.

Gallagher & Paul, Mandan, for appellants, Brotherhood of Railroad Trainmen.

Conmy & Conmy, Fargo, and Frank S. Farrell, St. Paul, Minn., for appellants and respondents, Northern Pac. R. Co., and Northern Pac. Transport Co.

BURKE, Judge.

These appeals are from a judgment of the District Court of Foster County reversing three orders of the Public Service Commission. Two orders denied an application of the Northern Pacific Railway Company to curtail certain branch line service in this state and the third order denied the application of the Northern Pacific Transport Company, a subsidiary of the railway corporation, to substitute a truck-bus service over the highways for the curtailed railway service.

At the time of the filing of the railway and transport company applications the railway provided daily except Sunday, mixed passenger and freight train service on its branch line between Carrington and Turtle Lake, it provided identical service on its branch line between Oberon and Esmond. Between Oberon and Leeds and between Jamestown and Oberon it provided daily passenger and freight service. In its application it proposed, in lieu of the above service, to substitute a freight train running between Jamestown and Turtle Lake with a side trip to New Rockford, leaving Jamestown on Mondays, Wednesdays and Fridays and returning via the same route on Tuesdays, Thursdays and Saturdays; it also proposed to operate a freight train between Jamestown and Esmond with a side trip to Leeds, leaving Jamestown Sundays, Tuesdays and Thursdays and returning on Mondays, Wednesdays and Fridays.

This proposal would thus provide freight train service each way six days a week between Jamestown, Carrington and New Rockford, and tri-weekly freight service between Carrington and Turtle Lake and between New Rockford, Oberon, Leeds and Esmond. The railway company also proposed to furnish additional service, as seasonal demands required.

In the application of the Northern Transport Company, which was filed concurrently with that of the railway company, the transport company asked authority to trans-

port general commodities and express between Jamestown and Carrington, passengers, express, milk and cream and general commodities between Carrington and Turtle Lake and between Carrington and Esmond, by a truck-bus service to operate daily, except Sunday on a regularly scheduled service upon all routes.

It was clearly the intent of the applicants that the two applications should be considered together and that the service proposed by the transport company should be considered as a substitute for the service which the railway proposed to curtail. The Public Service Commission, however, refused to consider the applications together. It filed the railway company's application as three separate cases (5328, 5329 and 5340), one for each segment of the interlocking branch lines. It filed the transport company's application as case M–968. It heard and decided the railway company's application in all three cases adversely to the company. The railway company appealed to the district court from the orders denying its application in cases 5328, 5329 and 5340. The Public Service Commission withheld decision in the transport case M–968. Approximately one year after the submission of the latter case, the Northern Pacific Transport Company instituted proceedings in the District Court of Burleigh County for a writ of mandamus, directed to and ordering the Public Service Commission to decide the transport case. The district court granted the writ and this court affirmed the decision of the district court on appeal. State ex rel. Northern Pacific Transport Company v. Public Service Commission, N.D., 82 N.W.2d 597. In the proceeding for the writ of mandamus, it was the contention of the railway company and the transport company that the applications for curtailment of railway service and the substitution of truck-bus service were so interrelated that it was necessary that the appeal from the orders of the Public Service Commission in all cases be heard together. Both applicants desired either that both applications be granted or that

both be denied. The Public Service Commission contended that it could not make a decision in the transport case until after the railway case had been decided on appeal. It was asserted that any other procedure might endanger or seriously impair the freight and passenger service to the affected communities. It was apparent that the Public Service Commission felt that if its orders in the railway case were affirmed, no additional service would be needed, but that if its orders were reversed some substituted service would be essential. In this case we said (at page 602):

"We fail to see any merit in appellant's contention that the Commission could not decide the two cases of the Northern Transport Company until the district court had decided the companion cases of the Northern Pacific Railway Company. The facts and circumstances pertinent to the application for change in the train service have of necessity a bearing upon the application for substituted motor bus service and it would follow logically that the two applications ought to be considered together."

Conformable to the writ of mandamus issued in the above case, the Public Service Commission decided the case of the Northern Transport Company. It denied the application for truck-bus service and the transport company appealed to the district court. The appeals of the railway company and the transport company were heard together by the district court and, as a result of the appeals, judgment was rendered reversing the orders of the Public Service Commission. The instant appeals are from this judgment. In addition to the appeal of the Public Service Commission, there is an appeal in all of the cases by the railway brotherhoods and an appeal in transport company's case by motor carriers.

 The first issue raised by appellants on this appeal arises upon their assertion that the district court exceeded its jurisdiction by exercising original jurisdiction up-

on the appeals to the district court. It is contended that in considering together appeals from cases which had been considered separately by the Public Service Commission, the district court exercised original jurisdiction. In the brief of the Public Service Commission it is stated, "The District Court should have directed that the proceedings be sent back to the Commission and allow it to consider the applications together, instead of the court deciding to do so on its own initiative and without giving the Commission an opportunity to do so."

The record shows that the applications in all of these cases were filed at the same time; that they were all noticed for hearing at the same time and place; that the Commission had before it the evidence in support of all of the applications at the time it made its decision in the railway cases; that it withheld decision in the transport case because it considered that its final decision in this case would depend upon whether its decisions in the railway cases were sustained upon appeal; that when it finally decided the transport case, "its decision was largely, although not entirely predicated on the fact that the Commission had already rejected N. P.'s proposal to curtail freight service" and the findings of fact in the railway cases refer to the pending application in the transport case. It is evident therefore that in considering all of the cases together upon appeal, the district court did not consider any issues or any facts which were not before the commission at the time it considered the cases separately. We are agreed therefore that the procedure followed in district court was a proper exercise of appellate jurisdiction.

■ The next question presented relates to the proper construction of Section 49-1402, NDRC 1943. This section is as follows:

"Every railroad corporation operating a line of railroad within this state, except a branch line, whether such line is wholly within this state or partly within this state and partly within another state or foreign country, shall move over its line of road within this state, each way on every business day of the year, at least one local passenger train to consist of not less than one engine and tender and combination mail, express and baggage car, and two passenger coaches, and at least one freight train. If any railroad corporation shall make it appear to the commission that the business on any line of its road will not justify its operating both the passenger and freight trains herein provided for and said commission shall so order, such company may operate one mixed train on such line each way on every business day in the year, for such time as said commission may direct. Such mixed train shall be supplied with not less than one passenger coach and one combination baggage and passenger coach for the accommodation of passengers. For each violation of the provisions of this section the railroad company shall be subject to a fine of five hundred dollars."

It is the contention of the Commission that this statute requires a minimum of daily, except Sunday, mixed train service on all railroad lines in the state. On its face the statute exempts branch lines from the requirement. The arguments advanced in support of this contention are fully set forth and considered in Brotherhood of Locomotive Engineers v. Minneapolis, Saint Paul and Sault Ste. Marie Railroad Co., N.D., 92 N.W.2d 650. It is sufficient to say here that in the above case, after full consideration, the question was decided adversely to the contentions of the Public Service Commission and it was held that branch lines were exempted from the requirement of daily mixed train minimum service.

■ The remaining issues on this appeal are to be resolved upon a consideration of the evidence in the cases. Upon

these issues our review is limited to a consideration of whether the findings of fact made by the Public Service Commission are supported by the evidence and whether its conclusions and decision are supported by its findings of fact. Section 28–3219, NDRC 1943. Application of Ditsworth, 78 N.D. 3, 48 N.W.2d 22.

The reasons urged by the applicants for the allowance of their petition to curtail railway service and to substitute a truck-bus service in place of such curtailed service are:

"1. There is no public need for railway passenger service on the lines upon which it is proposed to be discontinued and the truck-bus service will provide for any who want public transportation a faster, more convenient and more accurately sheduled service than the present mixed train service.

"2. There is no public need for daily freight train service, and the substitution of tri-weekly train service and daily truck-bus service to transport L. C. L. shipments, express and cream will adequately serve public convenience and necessity.

"3. The U. S. Postoffice Department has served notice upon the railway that it will cancel the railways' contract to carry the mail and divert the mail from train to highway service, but that it will let the transport company carry the mail if these applications are allowed.

"4. That the granting of the applications will result in a substantial saving in out-of-pocket costs."

Upon the first of the issues, to wit: the need for passenger service, the record shows that on the Carrington-Turtle Lake branch the total passenger revenue from the year ending June 30, 1955 (the year immediately preceding the filing of the applications) was $730, the total passenger revenue per trip was $1.166 and the average

number of passengers per trip was 1.8. On the Oberon-Esmond branch, for the same year, the total passenger revenue was $198, the total passenger revenue per trip was 31.6 cents and the average number of passengers per trip was .9. The record also shows that mixed train service from a passenger point of view is unsatisfactory due to delays occasioned by the freight service which the train is required to perform. Since baggage, mail, express, milk and cream are customarily carried by passenger trains, we shall consider the evidence with respect to these commodities under this heading.

The daily mixed train between Turtle Lake and Carrington carries a combined mail-baggage car which handles mail, baggage, express, milk and cream. Exhibit 7 shows the express shipments for the year ending May 1, 1955. There were on the entire line an average of nine shipments per day with three stations, Goodrich, McClusky and Turtle Lake averaging more than one shipment per day, these averages being 1.2, 2 and 2.5 shipments, respectively. The gross express revenue, including all through charges on the express which either originates or terminates on this line, was $10,118.43. The express agency messenger who handles the express on the train was paid $6,792.94 and the agents received commissions of $1,012.22 for the same period. On the Esmond-Oberon branch for the same period express shipments averaged 4.625 shipments per day for the entire line. Gross revenues and expenses upon this line were not shown. The Division Supervisor of the Railway Express Agency stated that only about 25% of the gross revenue should be allocated to the Turtle Lake-Carrington branch and that unless some steps were taken to eliminate the cost of the railway express messenger by the substitution of over the road service, his company would make application to discontinue this express service.

For the year 1953, the Turtle Lake-Carrington branch carried an average of 43.69

cans of milk and cream each day. In 1954 the average dropped to 29.53 cans per day. The Esmond-Oberon branch averaged 8.53 cans per day in 1953 and 7.49 cans per day in 1954. Witnesses for the railway testified that the small volume of express and shipments of milk and cream could be handled more conveniently and dependably by the proposed truck-bus service. No evidence to the contrary has been called to our attention.

Upon the question of the need for daily freight service the record showed that the freight service on the Turtle Lake-Carrington line was a tri-weekly service from 1910 until 1931 when daily mixed train service was established. For the calendar year 1954, the volume of less than carload shipments averaged 34 shipments totaling 7,998 pounds per day for the entire line. The daily average of carload shipments was 5.13 cars originating and 2.44 cars terminating on the line each day. The daily average of less than carload shipments on the Esmond-Oberon branch was 13 shipments totaling 3,257 pounds for the entire line. The daily average of carloads both terminating and originating was 1.45 cars. Of the 1652 cars originating on the Turtle Lake-Carrington line 1591 consisted of grain and 46 livestock. Of the 457 cars originating on the Esmond-Oberon line 442 consisted of grain and 1 of livestock. About half of the grain shipments were made during August, September and October.

In 1929, operating a tri-weekly freight service, the railway handled 3,390 carloads of grain and 992 carloads of livestock on the Turtle Lake-Carrington line and 932 carloads of grain on the Esmond-Oberon line.

Two witnesses residing at Sykeston testified against the proposed change on the Turtle Lake-Carrington branch. Seven witnesses, residing at Brinsmade, Leeds, Sheyenne and Minnewaukan testified against the proposed change north of New Rockford to Leeds. There were no opposition witnesses from the Esmond-Oberon line. Five of these witnesses were elevator operators. Their principal objection to tri-weekly service was that their side tracks would only accommodate two or three cars; that therefore they would be able to ship two or three cars every other day instead of every day as they do with daily service and as a result their elevators would become blocked and they would lose business to competing elevators on other railroads. One of these witnesses testified that tri-weekly service would increase the hazard in buying grain that can't be hedged. The other witnesses testified generally that whenever service to a community is curtailed, the community must be injured and that they might lose sales because of delays in delivery of tractors and other commodities.

Twelve witnesses residing at Turtle Lake, McClusky, Goodrich, Chasely and Bowdon testified in favor of the proposed changes on the Turtle Lake-Carrington branch. Two witnesses residing at Oberon and Flora testified in favor of the changes on the Esmond-Oberon line. These included four elevator operators who testified that tri-weekly service would be satisfactory and they included one operator who had ten years experience with tri-weekly freight service before the daily mixed train service was established on this line. On cross-examination each of these operators testified that their sidetracks would accommodate five or more cars. All of these witnesses testified generally that through service from Turtle Lake to Jamestown and from Esmond to Jamestown, even though tri-weekly, would offset any advantage that the present daily service may have because it would eliminate the delays at the junction points of Oberon and Carrington, where missed connections often caused layovers of 24 hours. It was pointed out that this delay was critical in cattle shipments.

The evidence concerning the mail situation on the Turtle Lake-Carrington line is

undisputed. It clearly appears that the railway is about to lose this mail contract and that the contract will be given to the transport company if its application to institute truck-bus service is granted.

The testimony relating to the application of the Northern Transport Company was generally to the effect that the proposed truck-bus service would provide passenger, express and less than carload lot freight service that would be more convenient and reliable than the mixed train service. The only witnesses who testified in opposition to the application were the holders of Class A and Special Truck Transportation Certificates which authorize them to transport goods by truck over parts of the routes over which the Northern Transport Company proposes to operate. These objections were based solely upon opinions that the proposed service would hurt their businesses. It appeared from the testimony that there was no regular truck service north of Carrington or west of the junction of Highways 7 and 52 on the Turtle Lake Line.

Upon the evidence, the Commission made Findings of Fact which in part are as follows:

In cases 5328 and 5340.

"3. That applicant proposes to discontinue the operations of said trains 173 and 174 (between Oberon and Esmond) and to substitute tri-weekly carload freight service and continue such additional 1. c. 1. freight service as is necessary to supplement the freight capacity of certain bus-truck units proposed to serve this area under another pending application."

"4. That freight Trains 781 and 782 between Jamestown and Oberon now operated daily except Sunday would be reduced to tri-weekly service pursuant to the amended application herein if granted."

"5. That service provided by Trains 173 and 174 between Oberon and Es-

mond, North Dakota is the only service offered on said line of railroad by applicant and discontinuance of this service would remove all of applicant's public passenger, express, milk, cream and baggage service from to and between these communities."

"8. That daily-except-Sunday mixed train service of Trains 173 and 174 and freight service by Trains 781 and 782 along and to this branch, is reasonably, adequate just and necessary service."

In case 5329.

"4. That the service substituted for Trains 159 and 160 as contemplated by applicant will be tri-weekly (three days per week) carload freight service, and such additional less-than-car-load freight service, as the limits in carrying capacity of certain bus-truck units proposed to serve this area, would not be able to carry."

"5. That the service provided by Trains 159 and 160, is the only service offered on said Turtle Lake branch line of the railroad by the Northern Pacific Railway Company; that no other railroad service between said points is available to the public and communities along said line of railroad."

"9. That no service less than daily-except-Sunday, passenger, express, 1. c. 1., milk and cream service will provide the communities along the Carrington to Turtle Lake line of railroad with reasonable adequate, just and necessary service."

In case M–968.

"2. That the proposed (bus-truck) route of service from Jamestown to Carrington is presently served by daily mixed train service of the Northern Pacific Railway Company."

"3. That the proposed route of passenger service from Carrington to Turtle Lake, North Dakota and Es-

mond, North Dakota, respectively are presently served by mixed trains of the Northern Pacific Railway Company."

"7. That public convenience and necessity will not be served by the duplication which would result from granting the application of Class 'A' authority authorizing motor passenger and freight service for the transportation of passengers and their baggage, express, newspapers, milk, cream and general commodities along the proposed routes of travel."

Upon these findings the Commission denied all of the applications.

The findings of fact themselves disclose how the Commission begged the real questions in the case by refusing to consider that the applications of the railway company and the transport company were interdependent. For instance in finding of fact 5 in cases 5328 and 5340, it is stated that discontinuance of the railway mixed train service "would remove all of applicant's public passenger, express, milk, cream and baggage service from, to and between these communities;" and in finding of fact 3 in case M–968 it is stated that the routes proposed to be served by the bus-truck service "are presently served by mixed trains of the Northern Pacific Railway Company." The import of these findings is that the application to suspend mixed train service was denied, at least in part, because the granting of the order would deprive residents along the route of all public, passenger, baggage, milk and cream service, while the application of the transport company which only offered to provide such service, in case the mixed train was discontinued, was denied because the territory was receiving mixed train service. It is clear that under such an approach to the issues in the case, there never could be any substitution of truck-bus service for any railway service, no matter how advantageous it might be for the communities concerned.

We are agreed that the finding of the Commission that nothing less than daily mixed train service will provide the communities concerned with adequate service is not sustained by the evidence. The use of the mixed train by passengers has been all but completely abandoned. The daily express, baggage, milk and cream and less than carload freight shipments along the routes of the railway are of such amount and number that the proposed truck-bus units are adequate to transport them and such transportation will be more regularly according to schedule and more convenient than the present mixed train service. For years prior to the establishment of daily mixed train service along the routes under consideration the only freight service was tri-weekly freight service. This tri-weekly service satisfactorily handled twice the present volume of railway freight over these lines. The proposed tri-weekly service, with daily switching service at all points, would in some respects be superior to the present daily service, in that the proposed service would be through service to the main line of the Northern Pacific at Jamestown, while the present service must make connections with other branch line service at Oberon and Carrington. Under the proposed service there would be no missed connections and layovers at branch line junctions. Upon the whole record, we are of the opinion that public convenience will be better served by the proposed combined transportation by railway and truck-bus than it is by the present service. For the reasons stated, the judgment of the district court reversing the orders of the Public Service Commission in these cases is affirmed.

However, the dissenting Commissioner in his opinion had this to say: "I would grant this application as prayed for and also authorize operation of truck-bus service which would be permitted only as an auxiliary service to the railroad." It was evidently this Commissioner's conclusion that some restrictions, not included in

the transport company's proposal, should be placed upon the truck-bus operations. In view of this statement and the appeal of the common carrier truckers in which they assert that competition by the transport company's truck-bus will be injurious to their operations, we direct that these cases be returned to the Public Service Commission for allowance of the applications of the railway company and the transport company subject to such limitations as are, in the judgment of the Public Service Commission, consistent with public convenience and the rights of authorized competing carriers in the territory.

SATHRE, C. J., and MORRIS, J., concur.